W. E. BIRMINGHAM, Respondent, v. ARCH CARR, Appellant.

Kansas City Court of Appeals, June 11, 1917.

1. REPLEVIN: Agister's Lien: Instructions. The plaintiff loaned one Armstrong a sum of money to settle two attachment suits, and took a mortgage on the horse which is the subject of this litigation. When the attachment suits were brought, the constable took charge of the horse under the writs and boarded the horse at the defendant's barn. After Armstrong settled the attachment suits and gave the mortgage on the horse, he made arrangements with the defendant, Carr, to board the horse. This was done several hours after the mortgage was executed. When the mortgage fell due the plaintiff demanded his horse or the money from Armstrong, and he was informed that the horse was located at Carr's barn. Carr refused to deliver up the horse claiming an agister's lien and the plaintiff instituted this suit in replevin against him. The issues were determined in favor of the plaintiff. Held, that an instruction given to the jury that while the horse was in the custody of the constable no lien accrued to the defendant for the keep of horse during said time, was erroneous.

2. ———: ———: ———. The lien of a mortgagee is superior to any agister's lien, if such lien is created prior to the placing of the horse with the agister and if the holder of the mortgage has in no way waived his right to priority.

3. ———: ———: ———. An agister who takes care of a horse under a contract with a bailee of the horse, and whom he knows to be in charge of the animal, as bailee, is bound to know the extent of the authority of such bailee, and he has no agister's lien as against the bailor.

4. ———: ———: Constables. It is the constable's duty under the law to take proper care of animals that are taken into his custody, and, if he does not do so he is liable, but it is not assumed that he will not place them in the custody of some one engaged in caring for like animals.

5. ———: ———: Chattel Mortgages. A chattel mortgage only becomes a lien on a horse as to third parties from the date that it is filed of record, and such mortgage must be recorded within a reasonable time after its execution.

Appeal from Gasconade Circuit Court.—*Hon. R. A. Breuer*, Judge.

REVERSED AND REMANDED.

*N. J. White* for appellant.

*C. W. Baxter* and *J. W. Hensley* for respondent.

BLAND, J.—On March 22, 1915, Dr. Samuel Armstrong was the owner of a certain horse which is the subject of this litigation, and on that day two attachment suits were filed against him and the constable on the same day seized said horse under said writs of attachment and placed the horse in a livery or feed stable owned by one Mathews. The constable continued to board said horse at Mathew's stable until the 1st day of April, 1915, when Mathews transferred the stable to defendant Carr, and on said day the constable arranged with said Carr to feed and care for the horse. On the 3rd day of April, 1915, trial was had of both of said attachment suits, resulting in a judgment against defendant in each case, and the constable continued in possession of said horse by virtue of said writs of at-

tachment until the 13th day of April, 1915, when the property was released by a settlement between Armstrong and the attaching creditors, wherein Armstrong borrowed the sum of one hundred and seventy-five ($175) dollars from plaintiff, Birmingham, with which to settle said two attachment suits, and at the same time gave said Birmingham a mortgage on said horse to secure said sum of money, and thereupon said horse was released under said writs of attachment and Lafe Armstrong, a son of Dr. Armstrong, went to the livery stable, then owned by appellant Carr, and requested Carr to allow him to take the horse out of the stable. Some argument was had as to whether the property was yet in the custody of the constable and young Armstrong suggested to Mr. Carr that he call Birmingham on the phone and ascertain if the horse had been released under the attachment. Thereupon a telephone conversation took place between Carr and Birmingham in which Birmingham told Carr that the matter had been straightened up and for Carr to turn the horse over to young Armstrong. Birmingham claims that he also told Carr that he had a mortgage on the horse. Carr denies this. Later on, on the same day, being the 13th day of April, 1915, about an hour and a half after said telephone conversation between Birmingham and Carr, and several hours after the execution of the mortgage to Birmingham, Dr. Armstrong and his son came to Carr's barn and made a contract with Carr whereby the latter was to board and care for the horse.

About the 20th day of August, 1915, when the mortgage given by Dr. Armstrong to Birmingham had matured and Birmingham after a diligent search was unable to find Dr. Armstrong to collect the money owing to the former, he told young Lafe Armstrong that he wanted either the horse or the money and was informed by said Armstrong that the horse was at Carr's barn, whereupon Birmingham went to Carr's barn and demanded the horse under his mortgage. Carr refused to deliver the horse, claiming that he had

an agister's lien upon it for his feed bill. Birmingham thereupon brought this replevin suit to recover possession of the horse.

The court instructed the jury that while the horse was in the custody of the constable from April 1, 1915, to April 13, 1915, that no lien accrued to the defendant for the keep of said horse during said period of time. Appellant claims that the court erred in so instructing the jury.

Unlike an artisan's common law lien an agister's lien, being of statutory creation and in derogation of the common law, must be strictly construed, and it has been often held that unlike an artisan's lien the lien of a mortgagee is superior to that of the agister if such lien was created prior to the placing of the horse with the agister, and if the holder of the mortgage has not in any way waived his right of priority. [Miller v. Crabbe, 66 Mo. App. 660; Lazarus v. Moran, 64 Mo. App. 239; Harding & Co. v. Kelso, 91 Mo. App. 607; Zartman-Thalman Carriage Co. v. Reid & Lowe, 99 Mo. App. 415.] And it is also held that an agister who takes care of a horse under a contract with a bailee of the horse, and whom he knows to be in charge of the animal as bailee, is bound to know the extent of the authority of such bailee and he has no agister's lien as against the bailor. [Sherwood v. Neal, 41 Mo. App. 416.]

However, the constable placed the horse in question in defendant's barn on April 1, 1915, to be fed, and Birmingham knew this when he took his mortgage on April 13, 1915, so that if the constable was able to create an agister's lien in favor of the livery stable man, such lien had priority over the lien of the mortgagee. However, it is strenuously insisted by the plaintiff that a constable could not create an agister's lien against the animal in the manner it is claimed it was created. Respondent cites no authorities to substantiate this claim but argues from the fact that the statute allows the constable compensation for the care and keep of animals in his custody under an attach-

ment writ and permits the expense of such care to be taxed as costs in the suit, and requires plaintiff to give bond for costs, clearly shows that the Legislature did not intend that a livery-stable man should have an agister's lien against an animal placed in his stable by the constable. The constable's position in reference to his possession of the animal is entirely different from that of an ordinary bailee and therefore this case is to be distinguished from cases such as the one of Sherwood v. Neal, supra, wherein it was held that there was no agister's lien for the reason that the party boarding out the horse was a bailee and for that reason the owner of the horse presumed that he, the bailee, would take care of the horse instead of putting it in a livery stable.

It is the constable's duty under the law to take proper care of the animal and if he fails to use ordinary care so to do he is liable. [Murfree on Sheriffs, sec. 261a; Harlow's Sheriffs and Constables (2 Ed.), sec. 256.] But it is not to be assumed that he will not place it in the custody of someone engaged in caring for like animals.

The attached property being *in custodia legis,* the power of the constable in respect to it is not different from that of a receiver who has taken property into his possession under the order of court appointing him. As to a receiver's power to create liens it was said in Vette v. Leonori, 42 Mo. App. l. c. 225:

"It is said in Kneeland v. American Loan and Trust Co., 136 U. S. 89, that a court which appoints a receiver acquires, by virtue of that appointment, certain rights and assumes certain obligations, and that the expenses, which the court creates in discharge of those obligations, are necessarily burdens on the property taken possession of, and this irrespective of the question, who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership." [See, also, Case Plow Works v. Union Iron Works, 56 Mo. App. 1.]

We are, therefore, of the opinion that the constable created an agister's lien against the horse in favor of defendant.

The fact that the constable could have had the feed bill charged as costs in the case would not prevent an agister from securing his lien against the horse, as the agister should not be put to the hazard of a constable failing to see that the agister's bill was properly charged as costs and that the same was paid. The facts in this case show that the constable did not see that such bill was paid. The statute gives the agister a lien upon the horse for his feed and makes no exception in the attaching of this lien in cases where the feed might be paid by some other means.

However, if the horse being *in custodia legis* is placed in a livery barn and while so being is sold, the purchaser would take it, no doubt, discharged of the agister's lien; but the lien would, we think, be valid against the proceeds arising from the sale of the horse in the custody of the court, just as the sale of goods in the custody of the court is discharged of the lien of the warehouseman in whose place the goods have been stored by the constable (see Case Plow Works v. Union Iron Works, supra), but whether this be so or not, no such question arises here, because the horse was released from the custody of the law without sale, so that the only question really after all is whether the constable had the power to place the horse in the stable, which, as we have held, he did. We are, therefore, of the opinion that the defendant had a lien upon the horse from April 1, 1915, to April 13, 1915, and the court erred in instructing the jury otherwise.

Appellant urges that he had a lien after April 13, 1915, because he claims that plaintiff as a matter of law waived his prior lien as mortgagee. The evidence shows that the mortgage was made several hours before Dr. Armstrong and his son made the new contract with defendant for the keep of the horse after the settlement of the attachment suits. The defendant, having made a new contract with the owner of the horse

for the horse's feeding, terminated his right to a fur-
ther lien under his contract with the constable. As
we have before stated, it has been often held that al-
though the mortgagee's lien is superior to that of the
agister, if it antedates that of the agister, neverthe-
less, such lien of the mortgagee may be waived by him
in favor of an agister, and it is held in Miller v. Crebbe,
supra, 1. c. 662, "If, . . . the mortgagee may be
presumed to have understood that the mortgagor would
take them to a stable keeper to be boarded, and no ob-
jection was made, such consent should be implied, other-
wise it should not. . . . The real question is, whe-
ther he (the mortgagee) has reason to believe, and does
believe, that they (the horses) are to be boarded at a
livery stable, or kept by anyone else than the mort-
gagor," but it is held in Lazarus v. Moran, supra, 1. c.
241, "The purpose of a mortgage is to furnish security,
and the property is usually left with the mortgagor for
his convenience, with an understanding that nothing
shall be done or permitted by him to impair the se-
curity. An agreement which will defeat the purpose of
the transaction should not be inferred or implied
against a mortgagee without very cogent evidence."

There is no evidence that plaintiff knew or under-
stood that Dr. Armstrong intended keeping the horse
in defendant's barn. The defendant claims that as
a matter of law plaintiff waived his lien in favor of
the agister for the reason that plaintiff knew that the
horse was in defendant's barn at the time he had the
telephone conversation with the defendant and knew
that it had been there and had been fed by the defend-
ant for sometime prior to the day of said conversation.

We do not think that these facts show as a matter
of law that plaintiff waived his prior lien. While plain-
tiff might have known that the horse was being boarded
by defendant under an arrangement with the constable,
it cannot be presumed from these facts alone that Dr.
Armstrong intended to board the horse with defendant,
but, on the other hand, it was but natural that Dr. Arm-

196 M. A.—27

strong would have taken the horse away from the stable after the attachment suits were settled up; at least, there is no presumption that he would leave it there.

The court properly submitted all these facts to the jury and left it to them to decide whether plaintiff had waived his prior lien, and as we cannot say as a matter of law that plaintiff did waive it, the finding of the jury on the question is conclusive.

It appears that the chattel mortgage from Dr. Armstrong to plaintiff was not recorded until the day after it was executed and, consequently, after the new contract between Dr. Armstrong and his son and defendant for the keep of the horse, made after the settlement of the attachment suits. The mortgage only became a lien on the horse, as to third parties, from the date that it was filed for record. [Sec. 2861, R. S. 1909; Stone v. Kelley and Son, 59 Mo. App. 1. c. 217, 218.] Therefore, defendant's lien created by the new contract with Dr. Armstrong and the latter's son and defendant for the keep of the horse created a prior lien to that of plaintiff's unless plaintiff recorded his mortgage within a reasonable time. [Bryson and Hardin v. Penix, 18 Mo. 13; Way v. Braley, 44 Mo. App. 457.] As the town of Bland, where the mortgage was executed, is several miles from the county seat of Gasconade County, the question of whether plaintiff recorded his mortgage within a reasonable time, no doubt, will be thrashed out in the trial anew.

The judgment is reversed and the cause remanded. All concur.